Can you IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISON

| | | |
|---|---|---|
| EDDIE LEE THACKER, | ) | CASE NO. 3:21-CV-01617-JRK |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES R. KNEPP, II |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY, | ) | CARMEN E. HENDERSON |
| | ) | |
| Defendant, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.    Introduction

Plaintiff, Eddie Thacker ("Thacker" or "Claimant"), seeks judicial review of the final decision of the Commissioner of Social Security denying his applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). For the reasons set forth below, it is RECOMMENDED that the Court OVERRULE Thacker's Statement of Errors and AFFIRM the Commissioner's decision.

## II.   Procedural History

On March 18, 2020, Thacker filed applications for DIB and SSI, alleging a disability onset date of January 2, 2020. (ECF No. 8, PageID #: 266–76). The applications were denied initially and upon reconsideration, and Thacker requested a hearing before an administrative law judge ("ALJ"). (ECF No. 8, PageID #: 165). On March 24, 2021, an ALJ held a hearing, during which Thacker, represented by counsel, and an impartial vocational expert testified. (ECF No. 8,

1

PageID #: 84). On April 5, 2021, the ALJ issued a written decision finding Thacker was not disabled. (ECF No. 8, PageID #: 55). The ALJ's decision became final on June 16, 2021, when the Appeals Council declined further review. (ECF No. 8, PageID #: 43).

On August 20, 2021, Thacker filed his Complaint to challenge the Commissioner's final decision. (ECF No. 1). The parties have completed briefing in this case. (ECF Nos. 11, 12, 14). Thacker asserts the following assignment of error:

> The ALJ's RFC determination is not supported by substantial evidence because it does not include a limitation to accommodate for Plaintiff's need for a walker.

(ECF No. 11 at 3).

### III. Background

#### A. Relevant Hearing Testimony

The ALJ summarized the relevant testimony from Plaintiff's hearing:

> At the hearing, the claimant testified he lives with his girlfriend. He related he could not read well. He stated he did have a driver's license and he was able to use a calculator. He testified he was let go from his last job for missing too much work in January 2020. He stated he has COPD and he typically wheezes when he breaths. He denied using oxygen but he has inhalers and he sleeps with a continuous positive airway pressure (CPAP) machine and nebulizer. He admitted he still smokes a pack of cigarettes per day despite his breathing issues. He testified he gets out of breath when walking and the cold makes his breathing worse too. He also stated he has a bad disc in his back that prevents him from standing more than five minutes and he cannot walk far without getting shooting pain down his leg as well as he was recently prescribed a walker. He testified he can only lift about 10 pounds as well and he gets out of breath walking with that much weight along with he has anxiety. He stated his memory was okay but he could not concentrate well or remember the plot of a television show when watching. He related that his hands will go numb at times too due to his blood pressure.

(ECF No. 8, PageID #: 64–65).

**B.       Relevant Medical Evidence[1]**

The ALJ also summarized Plaintiff's health records and symptoms:

> Turning to the objective evidence, while it establishes severe impairments, it is not consistent with the degree of severity alleged based upon the foregoing factors. For example, primary care records reflect the claimant complained of chronic back pain with radiation down the bilateral hips when trying to sleep at night with a back x-ray ordered when establishing care shortly after the alleged onset date in mid-February 2020 (Exhibit 6F/48-52). An ensuing radiologic imaging study of the lumbar spine found the claimant had degenerative disc disease at L5-S1 shortly after the alleged onset date in mid-February 2020 (Exhibit 1F/8).
>
> Yet, the initial primary care examination provided the claimant's gait and stance were normal, his back was normal and bowel sounds were normal at the visit (Exhibit 6F/51). The radiologic imaging study showed normal alignment on neutral, flexion and extension views too (Exhibit 1F/8). During a primary care visit in March 2020, the examination also demonstrated the claimant was in no acute distress with the musculoskeletal findings normal and no neurological deficits noted in spite of the claimant reporting of low back pain that was making him unable to walk far when combined with his shortness of breath (Exhibit 6F/32-34). The claimant as well appeared in no acute distress with overall normal findings in the musculoskeletal and the neurological exam without abnormalities upon examination at a follow up visit in the beginning of April 2020 (Exhibit 6F/27).
>
> Similarly, in April 2020, an imaging study of the lumbar spine with bending views signaled good range of motion without evidence of subluxation or other instability with lateral flexion and/or extension views (Exhibit 2F/18). While the claimant also complained of worsening back pain with radiation down to the toes in the right leg at the next primary care visit in mid-May 2020, he appeared in no acute distress with overall findings in the musculoskeletal again normal upon examination (Exhibit 6F/18-20). The claimant also underwent another ensuing lumbar spine radiologic imaging study with bending views in May 2020, which was unremarkable with no abnormal vertebral movement during flexion or extension (Exhibit 2F/6).

---

[1] Because Thacker's challenge involves only his physical impairments, the undersigned does not discuss the medical evidence involving his mental impairments.

3

Consequently, since the claimant still complained of lower back pain with radiation down the left and right legs at another primary care visit later that same month with the examination noting of reduced active range of motion with extension of the spine and tenderness in the paraspinal region, conservative treatment was simply recommended with ibuprofen and a muscle relaxer prescribed at the visit (Exhibit 6F/13-17). The claimant was also referred to an orthopedic specialist that recommended physical therapy, which he began towards the end of May 2020 (Exhibits 4F/4-8, 6F/16 and 11F/12-34).

Subsequently, the claimant reported of no relief with the physical therapy at an orthopedic visit towards the end of July 2020, although he attended only eight visits (Exhibits 7F/2 and 11F/16). A magnetic resonance imaging (MRI) in the interim, in June, also demonstrated the degenerative disc disease at L5-S1 and to a lesser degree L4-5, but there was a new finding of prominent epidural fat at L5-S1 contributing to mass effect on the thecal sac that was new since 2010 (Exhibits 10F/8-9 and 11F/5-6). This led to the orthopedic examination exhibiting the claimant's gait was antalgic and he had reduced range of motion in the lumbar spine with paraspinal tenderness (Exhibit 7F/3-4).

Regardless, the claimant had normal alignment in the cervical and lumbar spines, full strength in the bilateral lower and upper extremities, negative straight leg raise, an intact sensory exam and normal reflexes (Exhibit 7F/3-4). This led to the orthopedic provider again recommending conservative treatment in the form of pain management or a back brace (Exhibit 7F/4). The claimant elected to attend pain management for possible epidural injections (Exhibit 7F/4). He attended an initial pain management visit in mid-August 2020 (Exhibits 8F/4-6 and 9F/3-7). The pain management examination showed the claimant had tenderness in the lumbar back but his gait was normal, his coordination was normal and he had no edema or deformity (Exhibits 8F/6 and 9F/6). Interventional therapy in the form of physical therapy was discussed and the claimant elected to proceed with such treatment as a result (Exhibits 8F/7 and 9F/7).

In the meantime, the claimant reported of extreme back pain that made him unable to walk fair without stopping and he reported his therapist recommended a four-wheel walker with a seat so he could rest more when walking at a primary care visit in the beginning of December 2020 (Exhibit 15F/16-20). The claimant was prescribed the walker despite the claimant's gait and station being normal

upon examination at the visit (Exhibit 15F/19-20). His gait and stance was also observed to be normal and he appeared in no acute distress at a primary care visit in midDecember 2020 (Exhibit 15F/5-6). Ensuing radiologic imaging studies the bilateral hips and lumbar spine as well provided he had only mild degenerative in January 2021 (Exhibit 19F/3-4).

The claimant also attended a pain management appointment in the beginning of January 2021 (Exhibit 19F/11-12). During the appointment, lumbar tenderness to palpation was in the lumbar spine and paraspinal musculature, pain was elicited with flexion, extension and lateral rotation of the lumbar spine with range of motion diminished with these motions, facet loading maneuvers were positive and there was slightly diminished strength in the bilateral anterior tibialis and posterior tibialis along with positive straight leg raise at 60 degrees and decreased sensation to the bilateral L5 dermatomal distribution (Exhibit 19F/12). However, there was no cognitive impairment, extremities were without edema and there was palpable pulses, his gait was nonantalgic with no sign of a walker, coordination was intact, strength was normal throughout the rest of the bilateral lower extremities and there was no other sensory deficits (Exhibit 19F/12). Once more, conservative treatment was recommended with the claimant simply prescribed a muscle relaxant to his regimen and an MRI ordered (Exhibit 19F/12).

The ensuing MRI findings were similar to the prior study in June 2020 (Exhibit 22F/8-9). The claimant also returned to pain management in February 2021 (Exhibits 22F/22-23 and 23F/7-8). The examination showed no changes from the previous visit and it was decided the claimant would still pursue conservative treatment measures in the form of an epidural steroid injection being ordered and the nerve pain medication gabapentin being prescribed at the visit (Exhibits 22F/22-23 and 23F/7-8).

Likewise, the claimant complained of shortness of breath when establishing care with a primary care provider in mid-February 2020 (Exhibit 6F/48). The primary care examination noted of the claimant's oxygen saturation being 98 percent with breath and/or voice sounds normal and his skin normal but a chest x-ray was ordered and he was restarted on his inhalers (Exhibit 6F/50- 52). The chest x-ray revealed no acute disease in February 2020 (Exhibit 1F/8-9). Nonetheless, the claimant related he was still having shortness of breath despite resuming his inhalers (Exhibit 6F/40). The examination itself provided the claimant's oxygen saturation was at 96 percent and the claimant was advised he could

expect shortness of breath as long as he continued to smoke to excess daily (Exhibit 6F/42). He was still given a nebulizer to use three times a day and ordered to undergo a spirometry at the appointment (Exhibit 6F/42).

Thereafter, the claimant returned for the spirometry in the beginning of March 2020 (Exhibit 6F/36-39). The spirometry revealed a decline in lung function compared to a study in August 2018, with his forced expiratory volume in one second (FEV1) decreased to be consistent with a mild restriction (Exhibit 6F/39). The provider signaled that the claimant had been off his inhaler for about one year and he was smoking but his inhaler was switched and he was given a nicotine patch at the visit (Exhibit 6F/39). The examination at the visit still found the claimant's oxygen saturation was 98 percent and his chest was normal to percussion with normal breath sounds and no wheezing, rhonchi or rales/crackles heard (Exhibit 6F/38).

Afterwards, the claimant continued to complain of shortness of breath, primarily with activity, in spite of the change in inhalers and using the nebulizer three times a day at a follow up visit later in March (Exhibit 6F/32). He continued to smoke though (Exhibit 6F/32). This led to the provider merely referring the claimant to a pulmonary specialist (Exhibit 6F/35). During a follow-up primary care visit towards the beginning of April, the claimant stated that his breathing was somewhat improved, although long distances was still an issue, with the new inhaler and he simply requested refills of his medications at the visit (Exhibit 6F/25).

Correspondingly, in April 2020, another chest x-ray as well exhibited an unchanged chest with no active disease (Exhibit 2F/17). A subsequent pulmonary function test, in May 2020, also demonstrated only mild non-specific ventilator abnormality with reductions in FEV1 and forced vital capacity (FVC) and mildly reduced diffusion capacity with no significant response to bronchodilator therapy (Exhibits 2F/7 and 11F/37-38). Otherwise, the claimant's FEV1 and FVC ratio was also normal and there was no evidence for restrictive lung disease (Exhibit 2F/7). While the claimant also complained of again of breathing difficulty at a primary care visit in June 2020, the examination itself found his breath sounds were normal and he was in no acute distress resulting in the claimant merely being referred for another pulmonary consultation and advised to stop smoking at the visit (Exhibit 6F/2-6).

The claimant did not attend a pulmonary consultation. The

claimant further reported his breathing was much more difficulty with the hot weather at an ensuing primary care visit in midJuly 2020, but he appeared in no acute distress at the appointment (Exhibit 12F/18-20). His breath sounds also appeared normal at an ensuing primary care appointment in August 2020 (Exhibit 12F/16). He subsequently did request another pulmonary referral and his request was granted at a primary care visit in mid-September 2020 (Exhibit 12F/4-9). The examination at the visit nonetheless still found the claimant's oxygen saturation was at 98 percent while his breath sounds were normal and his skin exam normal (Exhibit 12F/8). In the beginning of October, the claimant as well denied having any wheezing, chest pain, dyspnea or coughing up sputum while the examination signaled his oxygen saturation was 96 percent at a primary care visit (Exhibit 15F/37-39).

Finally, the claimant did attend a visit with a pulmonary specialist in mid-October 2020 (Exhibit 13F/4-9). At the visit, the claimant's oxygen saturation (SpO2) was 98 percent, his lungs had normal expansion and clear to auscultation without rales, rhonchi or wheezing and his extremities were without edema but he was referred for a pulmonary function test and sleep study (Exhibit 13F/7-9). In the interim, primary care examinations continued to reveal the claimant's oxygen saturation was 96 percent or above despite a decrease in breath sounds upon examination at appointments in December 2020 (Exhibit 15F/5, 19).

Notably, the sleep study found the claimant only had mild obstructive sleep apnea with only mild oxygen desaturations towards the end of December 2020 (Exhibit 18F/14-15). This led to positive airway pressure (PAP) therapy being recommended but the claimant admitted to not using the therapy at night during a cardiology appointment in February 2021 (Exhibits 18F/30 and 21F/5). It was recommended he follow up with pulmonary for his sleep issues at the cardiology visit (Exhibit 21F/7). This led to him undergoing another sleep study with PAP therapy but he was unable to tolerate the masks and consideration was to be given to the claimant undergoing a PAP nap study to find a more tolerable mask (Exhibit 24F/12-13). In an ensuing CPAP titration study in March, the claimant did not have difficulty tolerating the pressure using a Simplus medium full-face mask (Exhibit 24F/31-32).

Moreover, treatment records reflect a history of hypertension (Exhibit 1F/28, 37). Unfortunately, the claimant admitted to stopping his hypertension medication prior to the alleged onset date (Exhibit 1F/28, 36). He subsequently was found to have high

7

blood pressure around the alleged onset date at orthopedic surgery visits in January 2020 and in February 2020 (Exhibit 1F/12, 18). The claimant reported he was unable to afford his hypertension medication at those times (Exhibit 1F/12, 18). However, the claimant was encouraged to call the compassion clinic or return to his primary care provider to determine if there was any assistance programs that he could qualify for in order to assist with his blood pressure and breathing medications (Exhibit 1F/12, 18).

As a result, the claimant established care with a primary care provider shortly afterwards wherein he admitted to being out of his medications for nine months (Exhibit 6F/48). He also related that a stress test had been recommended but he had not followed through with the procedure (Exhibit 6F/48). The claimant was restarted on his hypertension medications at the visit (Exhibit 6F/52). The medications appeared to be relatively effective in assisting with his blood pressure control but he was referred to a cardiologist to investigate his breathing issues.

Later, the claimant underwent an echocardiogram showing his left ventricular systolic function was hyperdynamic with a visually estimated ejection fraction of more than 70 percent, there was mildly increased left ventricular wall thickness and systolic anterior motion of the chordae of the mitral valve in May 2020 (Exhibit 2F/11-15). A stress test later that same month as well was abnormal with inferolateral ischemia, premature ventricular contractions and an ejection fraction of 75 percent with normal wall motion (Exhibits 2F/4, 3F/4 and 11F/35). This led to the suggestion to optimize medical therapy to reduce atherosclerotic risk (Exhibits 2F/4 and 3F/4).

Further, the claimant underwent a cardiac catheterization in the beginning of September 2020 (Exhibits 10F/5-6, 11F/2-3 and 19F/72-73). The procedure showed only mild three-vessel coronary artery disease and mild pressure gradient from the left ventricle across the aortic valve suggestive of mild aortic stenosis and normal systemic pressures (Exhibits 10F/5, 11F/2 and 19F/72). Once more, optimizing medical therapy to reduce atherosclerotic risk was simply recommended along with smoking and alcohol cessation was recommended following the procedure (Exhibit 10F/5). He also underwent a Holter monitor exam wherein sinus rhythm and sinus tachycardia with normal heart rate ranges were seen with very rare premature atrial and ventricular contractions and no significant arrhythmias were seen in September 2020 (Exhibit 19F/50).

> In mid-October, primary care records did signal that the claimant's blood pressure was elevated and he had swelling in the bilateral ankles and he was started on a new blood pressure medication as a result (Exhibit 15F/33-36). His blood pressure was remained high a week later but there was no notice of any swelling (Exhibit 15F/25-28). His new medication was increased though and his blood pressure had decreased by the next visit in the beginning of November (Exhibit 15F/23-28). He also had no complaints at a cardiology visit at the end of October 2020 (Exhibit 21F/8).

(ECF No. 8, PageID #: 65–69).

    C.        **Opinion Evidence at Issue**

        1.        **Katie Freese, MOT, OTR/L**

On December 2, 2020, occupational therapist, Katie Freese, completed a Functional Capacity Evaluation. (ECF No. 8, PageID #: 770). Ms. Freese noted that Thacker "demonstrated deficits in material handling, squatting, and firm grasping . . . [and] demonstrated poor body mechanics during material handling and squatting testing causing safety concerns." (ECF No. 8, PageID #: 770). She stated that Thacker's reports of pain were reliable based on the OccuPro Functional Pain Scale as Thacker's reports of increased pain were accompanied by an increase in heart rate and other "true pain behaviors." (ECF No. 8, PageID #: 770). As a result, Ms. Freese opined that Thacker could occasionally sit, stand, walk, forward reach, simple grasp, pinch, utilize gross and fine coordination, and bend. (ECF No. 8, PageID #: 771). She also concluded that Thacker should avoid lifting, carrying, pushing, pulling, firm grasping, and squatting. (ECF No. 8, PageID #: 771). Based on Thacker's performance, Ms. Freese stated that "it is unlikely [he] would be able to maintain gainful employment." (ECF No. 8, PageID #: 770). She also suggested that Thacker "would benefit from the use of a 4ww for increased stability and endurance during functional tasks." (ECF No. 8, PageID #: 770).

The ALJ concluded that Ms. Freese's opinion was not persuasive. She reasoned:

> Ms. Freese's opinion is based upon only a snapshot of the claimant's functioning during a one-time evaluation and not the claimant's longitudinal functioning, which renders it unpersuasive. Mentioned above, although primary care records provided the claimant complained of chronic back pain and shortness of breath, examinations consistently revealed the claimant's oxygen saturation was 96 percent or higher, his gait and stance were normal and his musculoskeletal findings were normal (Exhibits 6F/4-5, 27, 34-42, 50-51, 12F/8, 16 and 15F/5-6, 19, 38-39). Pain management and orthopedic records also exhibited the claimant's extremities were without edema and there was palpable pulses, coordination was intact, strength was normal throughout the bilateral lower extremities, except at the tibialis where there was a slight diminishment, and there was no sensory deficits except at the bilateral L5 dermatomal distribution (Exhibits 7F/3-4, 8F/6, 9F/6, 19F/12, 22F/22-23 and 23F/7-8).
>
> In addition, lumbar imaging studies with bending views demonstrated the claimant had good range of motion without evidence of subluxation or other instability with lateral flexion and/or extension views while spirometry and pulmonary function tests found only a mild restriction and cardiac testing signaled he had only mild coronary artery disease (Exhibits 1F/18, 2F/6-7, 18, 6F/39, 10F/5, 11F/2, 37-38 and 19F/72). Consequently, the longitudinal record does not support Ms. Freese's opinion regarding the claimant's ability to perform fine motor tasks, gross motor tasks, simple grasping, pinching, firm grasping, walking, sitting, standing, reaching, bending, lifting, carrying, pushing and pulling . . . .

(ECF No. 8, PageID #: 70).

### 2. Abbey Whitney, CNP

On December 3, 2020, nurse practitioner Abbey Whitney prescribed Thacker a rolling walker with a seat to help with his chronic obstructive pulmonary disease. (ECF No. 8, PageID #: 676). On December 21, 2022, Ms. Whitney filled out a physical assessment form. (ECF No. 8, PageID #: 710). She opined that Thacker would need fifteen-to-twenty-minute breaks every hour throughout the workday to recline or lie down. (ECF No. 8, PageID #: 711). Ms. Whitney stated that Thacker could sit for one hour a day and stand or walk for zero hours in a day. (ECF

10

No. 8, PageID #: 711). She suggested that Thacker could occasionally lift and carry less than ten pounds and never lift more than that. (ECF No. 8, PageID #: 711).

The ALJ concluded that Ms. Whitney's opinion was not persuasive. She explained:

> While primary care records reflected the claimant complained of chronic back pain and shortness of breath, examinations consistently showed the claimant's oxygen saturation was 96 percent or higher, he was oriented to person, place and time, his gait and stance were normal and his musculoskeletal findings were normal (Exhibits 6F/4-5, 27, 34-42, 50-51, 12F/8, 16 and 15F/5-6, 19, 38-39). Lumbar imaging studies with bending views also showed the claimant had good range of motion without evidence of subluxation or other instability with lateral flexion and/or extension views while spirometry and pulmonary function tests exhibited only a mild restriction and cardiac testing noted of only mild coronary artery disease (Exhibits 1F/18, 2F/6-7, 18, 6F/39, 10F/5, 11F/2, 37-38 and 19F/72). Thus, the above objective evidence does not support Ms. Whitney's opinion of such severe restrictions on the claimant's ability to perform simple work-related tasks, walk, stand, sit and lift or support the unscheduled breaks and absenteeism contemplated. The undersigned does not find the opinion persuasive as a result.

(ECF No. 8, PageID #: 69–70).

### IV. The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

> 3. The claimant has the following severe impairments: lumbar degenerative disc disease; chronic obstructive pulmonary disorder (COPD); nicotine dependence; sleep apnea; major depressive disorder; and adjustment disorder with anxiety (20 CFR 404.1520(c) and 416.920(c)).
>
> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> 5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and

11

> 416.967(b) except: He can occasionally climb ramps and stairs. He can frequently balance. He can never climb ladders, ropes, or scaffolds. He should avoid concentrated exposure to workplace hazards such as unprotected heights and moving mechanical parts. He should avoid concentrated exposure to temperature extremes such as extreme heat and/or cold or humidity and wetness. He should avoid concentrated exposure to pulmonary irritants such as dusts, odors, toxins and fumes. He is limited to simple tasks in a routine work setting, but not at a production rate pace, for example, no assembly line work. He is limited to occasional changes in the workplace that are easily explained. He is limited to occasional interaction with supervisors, coworkers, and the general public.

(ECF No. 8, PageID#: 61–63).

## V. Law & Analysis

### A. Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

B.        **Standard for Disability**

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.*

C.       **Discussion**

Thacker raises one issue on appeal. Thacker argues that the ALJ's RFC determination was not supported by substantial evidence because the ALJ failed to include a limitation for Plaintiff's need for a walker. Thacker states that it was error for the ALJ to determine the walker was not medically necessary without even mentioning the relevant Social Security Rulings. Thacker suggests that that this omission resulted in a failure to provide a logical bridge between the evidence and the result. The Commissioner responds that the ALJ appropriately determined

13

there was insufficient medical documentation that a walker was necessary. The Court agrees with Commissioner.

> Social Security Regulation 96-9p provides:
>
>> To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information).

Generally, an ALJ's finding that an assistive device is not medically necessary "is error when the claimant has been prescribed an assistive device and the ALJ did not include the use of the device in the RFC assessment without providing an explanation for the omission." *Johnson v. Comm'r of Soc. Sec.*, No. 1:20CV1089, 2021 WL 2810130, at *12 (N.D. Ohio May 28, 2021) (citations omitted).

As an initial matter, Thacker must demonstrate that his walker was medically required. *See Coleman v. Comm'r of Soc. Sec.*, No. 3:20-cv-155, 2021 WL 3184948, at *3 (S.D. Ohio July 28, 2021) ("[I]f a cane is not medically required, it cannot be considered a restriction or limitation on a claimant's ability to work." (citing *Carreon v. Massanari*, 51 F. App'x 571, 575 (6th Cir. 2002))). As noted above, to be medically required, "there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed." SSR 96-9p. It is undisputed that Thacker was prescribed a walker, meeting the first requirement. Whether the second requirement—a description of the circumstances—was met, is disputed. The Commissioner argues that the circumstances were not described because Ms. Whitney did not include any circumstances in her prescription. Thacker, however, asserts that Ms. Freese explained the

14

necessary circumstances. Additionally, Thacker states the ALJ erred in failing to discuss these circumstances. The Court disagrees.

Ms. Freese evaluated Thacker and suggested that Thacker would benefit from a walker. Specifically, she stated:

> Client has difficulty completing basic activities of daily living at home due to low back pain and endurance including dressing, bathing, and grocery shopping. He would benefit from adaptive equipment to assist in lower body dressing/bathing. He would also benefit from the use of a 4ww for increased stability and endurance during functional tasks.

(ECF No. 8, PageID #: 770). Following this recommendation, Thacker told his nurse practitioner, Ms. Whitney, that his therapist "would like him to walk more, and would like a 4 wheel walker with a seat so he can rest more while walking." (ECF No. 8, PageID #: 673). As a result, Ms. Whitney prescribed Thacker a rolling walker with a seat. Ms. Whitney noted that this prescription was for chronic obstructive pulmonary disease but did not indicate in what circumstances the walker should be used.[2] (ECF No. 8, PageID #: 676).

Plaintiff's contention that the ALJ failed to build a logical bridge between the recommendation and prescription from these medical sources and the resulting RFC is unavailing. The ALJ properly explained why she did not include the need for the walker in the RFC. In particular, the ALJ stated:

> [T]he claimant's primary care provider prescribed a four-wheeled walker with seat for the claimant after he indicated an occupational therapist suggested the device following a functional capacity evaluation in December 2020 (Exhibit 15F/16-20). Nevertheless, primary care examinations before and after the device was prescribed consistently noted the claimant's gait and station were normal and/or musculoskeletal findings were normal with no

---

[2] Notably, Ms. Whitney's notes are the only place that indicate that the walker was needed for chronic obstructive pulmonary disease.

15

> neurological deficits noted (Exhibits 6F/13, 19-20, 27, 33-34, 51 and 15F/5-6, 19). Pain management records also demonstrated the claimant's gait was non-antalgic, his coordination intact, his strength normal except at the tibialis and there was no sensory deficits except at the bilateral L5 dermatomal distribution with no mention of the use of a walker after he was prescribed the device (Exhibits 19F/12, 22F/22 and 23F/7).
>
> Likewise, a recent magnetic resonance imaging study of the lumbar spine showed no definite impingement and only mild spinal canal stenosis at L4-L5 and L5-S1 with no significant central canal or neural foraminal stenosis at the other levels of the lumbar spine (Exhibit 22F/8-9). *As a result, the undersigned does not find the four-wheeled walker is medically necessary* and The claimant's impairment does not meet Listings 1.15 and 1.16, as each of the criteria required are not met, including impairment related physical limitation of musculoskeletal functioning as defined by the listings. Respiratory testing also does not exhibit the requisite deficits and there are no hospitalizations due to his breathing issues in order to meet Listing 3.02 (Exhibits 2F/7- 10, 6F/39, 11F/37-38, 18F/14-15, 30 and 24F/12-13, 31-32).

(ECF No. 8, PageID #: 62) (emphasis added).

Clearly, the ALJ explained why she did not find the walker was necessary for Thacker's back impairments and Thacker does not take issue with this explanation. Instead, Thacker states that this discussion was error because it failed to explain why the walker was not necessary for his chronic obstructive pulmonary disease. The undersigned disagrees.

First, it was not necessary for the ALJ to explain why the walker was not required for chronic obstructive pulmonary disease to build a logical bridge between the prescription and the RFC. Ms. Freese's opinion did not state that the walker was necessary for chronic obstructive pulmonary disease. Instead, she discussed Thacker's back pain and then recommended a walker

> neurological deficits noted (Exhibits 6F/13, 19-20, 27, 33-34, 51 and 15F/5-6, 19). Pain management records also demonstrated the claimant's gait was non-antalgic, his coordination intact, his strength normal except at the tibialis and there was no sensory deficits except at the bilateral L5 dermatomal distribution with no mention of the use of a walker after he was prescribed the device (Exhibits 19F/12, 22F/22 and 23F/7).
>
> Likewise, a recent magnetic resonance imaging study of the lumbar spine showed no definite impingement and only mild spinal canal stenosis at L4-L5 and L5-S1 with no significant central canal or neural foraminal stenosis at the other levels of the lumbar spine (Exhibit 22F/8-9). *As a result, the undersigned does not find the four-wheeled walker is medically necessary* and The claimant's impairment does not meet Listings 1.15 and 1.16, as each of the criteria required are not met, including impairment related physical limitation of musculoskeletal functioning as defined by the listings. Respiratory testing also does not exhibit the requisite deficits and there are no hospitalizations due to his breathing issues in order to meet Listing 3.02 (Exhibits 2F/7- 10, 6F/39, 11F/37-38, 18F/14-15, 30 and 24F/12-13, 31-32).

(ECF No. 8, PageID #: 62) (emphasis added).

Clearly, the ALJ explained why she did not find the walker was necessary for Thacker's back impairments and Thacker does not take issue with this explanation. Instead, Thacker states that this discussion was error because it failed to explain why the walker was not necessary for his chronic obstructive pulmonary disease. The undersigned disagrees.

First, it was not necessary for the ALJ to explain why the walker was not required for chronic obstructive pulmonary disease to build a logical bridge between the prescription and the RFC. Ms. Freese's opinion did not state that the walker was necessary for chronic obstructive pulmonary disease. Instead, she discussed Thacker's back pain and then recommended a walker

> neurological deficits noted (Exhibits 6F/13, 19-20, 27, 33-34, 51 and 15F/5-6, 19). Pain management records also demonstrated the claimant's gait was non-antalgic, his coordination intact, his strength normal except at the tibialis and there was no sensory deficits except at the bilateral L5 dermatomal distribution with no mention of the use of a walker after he was prescribed the device (Exhibits 19F/12, 22F/22 and 23F/7).
>
> Likewise, a recent magnetic resonance imaging study of the lumbar spine showed no definite impingement and only mild spinal canal stenosis at L4-L5 and L5-S1 with no significant central canal or neural foraminal stenosis at the other levels of the lumbar spine (Exhibit 22F/8-9). *As a result, the undersigned does not find the four-wheeled walker is medically necessary* and The claimant's impairment does not meet Listings 1.15 and 1.16, as each of the criteria required are not met, including impairment related physical limitation of musculoskeletal functioning as defined by the listings. Respiratory testing also does not exhibit the requisite deficits and there are no hospitalizations due to his breathing issues in order to meet Listing 3.02 (Exhibits 2F/7- 10, 6F/39, 11F/37-38, 18F/14-15, 30 and 24F/12-13, 31-32).

(ECF No. 8, PageID #: 62) (emphasis added).

Clearly, the ALJ explained why she did not find the walker was necessary for Thacker's back impairments and Thacker does not take issue with this explanation. Instead, Thacker states that this discussion was error because it failed to explain why the walker was not necessary for his chronic obstructive pulmonary disease. The undersigned disagrees.

First, it was not necessary for the ALJ to explain why the walker was not required for chronic obstructive pulmonary disease to build a logical bridge between the prescription and the RFC. Ms. Freese's opinion did not state that the walker was necessary for chronic obstructive pulmonary disease. Instead, she discussed Thacker's back pain and then recommended a walker

for stability and endurance.[3] She did not discuss his chronic obstructive pulmonary disease symptoms at all in her discussion of the walker. Thacker told Ms. Whitney he needed the walker so that he could rest when walking. Then, Ms. Whitney stated that she was prescribing the walker for chronic obstructive pulmonary disease but did not give any explanation of this. Her prescription alone was not sufficient for the ALJ to conclude the walker was medically necessary as it failed to describe the circumstances for which the walker is needed. In fact, there is no indication at all of when Ms. Whitney intended the walker to be used. This alone precludes a determination that the walker was medically necessary. *See Meagher v. Comm'r of Soc. Sec.*, No. 3:20-CV-02502-JRK, 2021 WL 5925778, at *9 (N.D. Ohio Nov. 30, 2021) ("[D]ocumentation 'describing the circumstances for which [the assistive device] is needed' is critical to establishing that it qualifies as a 'necessary device' under SSR 96-9p." (second alteration in original) (citations omitted)).

Moreover, even if the undersigned considered the combination of Ms. Whitney's and Ms. Freese's statements, the description is insufficient.[4] Stating that a walker is necessary for "stability" and "endurance" during functional activities does not satisfy the social security regulations. *C.f. Wright v. Saul*, No. 1:18cv1724, 2019 WL 3729264, at *3 (N.D. Ohio Aug. 8, 2019) ("[The doctor's] notation that Plaintiff needs a cane 'for ambulation' does not satisfy this requirement. Indeed, by its very nature, one of the primary purposes of the cane is for

---

[3] Thacker appears to argue that "endurance" necessarily involves his chronic obstructive pulmonary disease. However, endurance means to endure an unpleasant process, such as back pain while walking.

[4] It is not clear to the undersigned that the medical documents should be read together as there is no clear indication that Ms. Freese's walker recommendation was based on Thacker's chronic obstructive pulmonary disease. After discussing Thacker's back pain, Ms. Freese stated that a walker would be needed for stability and endurance. Ms. Freese did not discuss Thacker's chronic obstructive pulmonary disease symptoms in making her recommendation. However, the undersigned will discuss the combination of the documents as it does not change the outcome.

ambulation."). The regulations specifically require that the description explain when the walker will be needed "i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information." Other than conclusively stating during "functional activities," there is no explanation of the circumstances. It is not clear to the undersigned what constitutes functional activities or what sort of terrain requires use of the walker. *See Wright*, 2019 WL 3729264, at *3 ("SSR 96-9p requires that medical documentation provide further information about the extent and nature of a claimant's need for a cane, such as how often the prescribing physician feels a claimant needs to use it and/or under what particular circumstances it is required."). Indeed, in similar situations, courts throughout the Sixth Circuit have upheld ALJ decisions that did not include the need for an assistive device in a claimant's RFC. *See, e.g.*, *Halama v. Comm'r of Soc. Sec.*, No. 1:12 CV 1859, 2013 WL 4784966, at *8 (N.D. Ohio Sept. 5, 2013) ("Inasmuch as there is no [statement of a physician containing the circumstances] in the record, I find that the decision of the ALJ in this case not to incorporate the use of a cane into the RFC is supported by substantial evidence."); *see also Meagher*, 2021 WL 5925778, at *10 (collecting cases).

Accordingly, the undersigned concludes that the ALJ did not err in failing to include the need for a walker in the RFC determination, and Thacker's argument is without merit.

## VI. Recommendation

Based on the foregoing, it is RECOMMENDED that the Court OVERRULE Thacker's Statement of Errors and AFFIRM the Commissioner's decision.

Dated: April 21, 2022

s/ *Carmen E. Henderson*
CARMEN E. HENDERSON
U.S. MAGISTRATE JUDGE

18

_____

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F. 3d 520, 530–31 (6th Cir. 2019).